UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF LOUISIANA

FEDERAL NATIONAL MORTGAGE                    CIVIL ACTION
ASSOCIATION

VERSUS                                       No. 22-2588

JOSHUA BRUNO                                 SECTION: "J"(1)

## ORDER AND REASONS

Before the Court is a *Motion for Partial Summary Judgment* **(Rec. Doc. 25)**
filed by Plaintiff, Federal National Mortgage Association ("Fannie Mae"); an
opposition thereto (Rec. Doc. 46), filed by Defendant, Joshua Bruno; and Fannie Mae's
reply (Rec Doc 50). The Court also takes judicial notice of facts contained in Fannie
Mae's *Request for Judicial Notice*. (Rec. Doc. 26). In that request, Fannie Mae outlines
foreclosure and bankruptcy actions relevant to this case, including the Bankruptcy
Court's order appointing a chapter 11 trustee. *Id.* at 3-4. Having considered the
motion and legal memoranda, the record, and the applicable law, the Court finds that
the motion should be **GRANTED**.

## FACTS AND PROCEDURAL BACKGROUND

Fannie Mae seeks partial summary judgment on Bruno's liability pursuant to
Bruno's guaranties guaranteeing the obligations of six separate borrowers, which are
Bruno-owned limited liability companies, which are all now in bankruptcy. The
motion seeks solely to establish Bruno's liability as a matter of law, reserving the
issue of damages for a later determination.

1

The timeline of transactions and communication between the parties stretches back almost ten years, starting when Greystone Servicing Corporation ("Greystone") executed four secured loan agreements pertaining to six separate multifamily properties with various borrower companies: Cypress Park Apartments, LLC; Westbank Holdings, LLC; Forest Park Apartments, LLC; Liberty Park Apartments, LLC; Washington Place, LLC; and Riverview Apartments, LLC ("Borrowers"). The loan amounts, dates, and parties are as follows:

- On or about December 23, 2014, Greystone loaned $2,790,000 (the "Cypress Park Loan") to Cypress Park Apartments, LLC ("Cypress Park Borrower") pursuant to the terms of a Multifamily Loan and Security Agreement (the "Cypress Park Loan Agreement").

- On or about December 23, 2014, Greystone loaned $2,163,750 (the "Forest Park Loan") to Forest Park Apartments, LLC, Liberty Park Apartments, LLC, and Washington Place, L.L.C. (collectively "Forest Park Borrower") pursuant to the terms of a Multifamily Loan and Security Agreement (the "Forest Park Loan Agreement").

- On or about December 23, 2014, Greystone loaned $2,031,250 (the "Riverview Loan") to Riverview Apartments, LLC ("Riverview Borrower") pursuant to the terms of a Multifamily Loan and Security Agreement (the "Riverview Loan Agreement").

- On or about March 27, 2018, Greystone loaned $22,150,000 (the "Westbank Holdings Loan") to Westbank Holdings, LLC ("Westbank Holdings Borrower") pursuant to the terms of a Multifamily Loan and Security Agreement (the "Westbank Holdings Loan Agreement").

Each Borrower executed a Loan Agreement and a Note with Greystone, secured by a Multifamily Mortgage, Assignment of Leases and Rents and Security Agreement. Each Note and Loan Document was assigned to Fannie Mae, the current owner and holder of each Note. Bruno signed a Guaranty of Non-Recourse Obligations pursuant to each note and loan agreement as well, which stated that he "absolutely,

unconditionally, and irrevocably guarantee[d] to Lender the full and prompt payment and performance when due. . .” (Rec. Docs. 25-7, 25-17, 25-27, 25-37, each at 2).

In his memorandum, Bruno contends that the Borrowers were “entities then current on their payments,” but provides no evidence, in his affidavit or otherwise, of same. (Rec. Doc. 46, at 17). Fannie Mae, conversely, provides an affidavit from Joel Shaddox, Senior Asset Manager for Fannie Mae, who declared that he was familiar with and personally reviewed the payments due and made under each loan. (Rec. Doc. 25-3). In the affidavit, Shaddox states that prior to April 2020, each Borrower failed to make all payments due under their loans. *Id.* at 3.

Pursuant to each Borrower’s claim that it was experiencing financial hardship due to the COVID-19 pandemic, Fannie Mae, through Greystone, entered into Forbearance and Non-Waiver Agreements with each Borrower on or about April 27, 2020, which declare that Fannie Mae will forbear from exercising its rights though June 30, 2020. The Forbearance Agreements also provided that the Borrower will be required to bring the loan current on June 30, 2020 or through payment of outstanding amounts due in equal monthly installments to be repaid on a schedule not to exceed twelve months following June 30, 2020. They also set state that,

> in the event Borrower fails to timely perform any of its obligations under this paragraph [regarding repayment], Fannie Mae’s agreement to forbear. . . shall immediately terminate, without further notice or demand, and Fannie Mae may, at its option, accelerate the Note and/or exercise any and all other rights and remedies available to it under the Loan Documents, at law or in equity.

(Rec. Docs. 25-10; 25-20; 25-30; 25-40, each at 2). They also provide,

notwithstanding Fannie Mae's agreement to forbear from exercising its rights and remedies and the acceptance of any partial payments at any time by the Servicer, **the Note remains in default**, and Fannie Mae does not waive any defaults set forth in this letter, or any other defaults which may exist or arise under the Note and any Loan Documents executed in connection with the Note.

*Id.* at 3 (emphasis added). Bruno signed each Forbearance Agreement on behalf of each Borrower, on page 5. *Id.* at 5.

On July 14, 2020, Fannie Mae, through its servicer Greystone, agreed to extend the Forbearance Agreements expiration date from June 30, 2020 to September 30, 2020. The forbearance extension forms stated that the Borrowers will be required to bring the loans current at the new September 30, 2020 expiration date or through monthly installments to be repaid on a schedule not to exceed the aggregate of four months for each month of forbearance provided, in addition to the current monthly obligation due under the note and loan agreement. The forms also state that,

notwithstanding Fannie Mae's agreement to forbear from exercising its rights and remedies and the acceptance of any partial payments at any time by the Servicer, **the Note remains in default**, and Fannie Mae does not waive any defaults set forth in this letter, or any other defaults which may exist or arise under the Note and any Loan Documents executed in connection with the Note.

(Rec. Docs. 25-11; 25-21; 25-31; 25-41, each at 3) (emphasis added). Bruno signed each Forbearance Extension on behalf of each Borrower, on page 4. *Id.* at 4. In his affidavit, Fannie Mae's Senior Asset Manager Shaddox declared that each Borrower subsequently failed to make required loan payments after the September 30, 2020 expiration of the forbearance extension, and the parties never executed another forbearance agreement after July 14, 2020. (Rec. Doc. 25-3, at 3).

4

On September 28, 2020, Brown emailed Bruno that, considering the September 30, 2020 expiration, Fannie Mae could consider an extension of a forbearance on a "Loan by Loan basis," which meant that Bruno would have to provide information with how an additional forbearance will provide a higher probability of success in your operation of the properties and in turn the loans. (Rec. Doc. 46-16, at 1). On October 1-3, 2020, Fannie Mae sent Bruno Pre-Negotiation Letters regarding all four loans, and Bruno and Shaddox both subsequently acknowledged and signed each letter. (Rec. Doc. 46-28). The Pre-Negotiation Letters stated that Bruno asked to meet with Fannie Mae to discuss problems associated with the Loans related to the pandemic and requested information from Bruno in preparation for the meeting. *Id.* They also provided the following "ground rules that will apply to [their] discussions," including:

1. . . .The fact we have consented to enter into discussions with you with respect to the Loan shall not affect any of Fannie Mae's rights and remedies under the Loan Documents, or our right to declare the Loan to be in default.
2. No Oral Modifications. . .
5. . . . You and we may, in our sole and absolute discretion, unilaterally discontinue discussions at any time, and for any or no reason, without liability whatsoever to the other party by reason of such discontinuation or termination.
6 . . . This letter constitutes the entire agreement between the parties concerning its subject matter, and supersedes any prior or contemporaneous representations or agreements not contained herein concerning modifications of the Loan. . .

*Id.*, each at 1-2, 5, 9, 13. In his affidavit, Bruno states that as of late October 2020, the Borrowers provided to Greystone the information requested in the Pre-Negotiation Letters. (Rec. Doc. 46-3, at 5). On November 18, 2020, Brown emailed Bruno that Fannie Mae was still reviewing his request for forbearance extension, and

Brown provided potential terms contingent upon which the forbearance might be granted. (Rec. Doc. 46-23).

On December 15, 2020, Fannie Mae, through counsel at Baker Donelson, mailed letters to Bruno regarding each loan. (Rec. Doc. 46-29). The letters stated that they served as notice, "as provided for in Paragraph No. 5 of the [Pre-Negotiation] Letter, of the termination by Fannie Mae of any continuing negotiations contemplated in the Letter." *Id.* at 1, 3, 6, 8. They also stated that "any prior offers or discussions of additional forbearance, modification or extension of the Loan by or on behalf of Fannie Mae or Greystone. . . are hereby rescinded and terminated consistent with the parties' agreement set forth in the [Pre-Negotiation] Letter." *Id.* at 2, 4, 6, 9.

Bruno alleges that, after receiving the December termination letters, the Borrowers made payments owed under the loans. (Rec. Doc. 46, at 25). According to a mortgage statement dated December 18, 2020, the payments for each loan were due January 1, 2021, and the "Grace Period End Date" was January 10, 2021. (Rec. Doc. 46-32, at 1, 3, 5, 7). Each statement included a monthly payment breakdown, including the amount of forbearance repayment due. *Id.* Bruno claims that the Borrowers were unable to make the loan payments via the internet as they had done in the past, so the Borrowers made the payments on January 4, 2021, by check, for the full amount due for each loan. (Rec. Docs. 46, at 20; 46-33). Bruno filed into the record copies of each check dated January 4, 2021; (Rec. Doc. 46-33); and each check amount reflects the amount each of the Borrowers owed as of the December 18, 2020 statements. Bruno emailed Fannie Mae's counsel on January 5, 2021 to see if she had

any questions on the items he previously sent to Greystone, and Fannie Mae's counsel responded that her client "would like to pursue its rights and remedies under the loan agreements." (Rec. Doc. 46-30, at 2).

On January 8, 2021, Fannie Mae sent a default and acceleration letter to each of the Borrowers and Bruno, as the Guarantor. (Rec. Doc. 46-31). The letters recounted the 2020 communications between the parties as well as the forbearance agreement and extension for each loan. *Id.* The letters also stated that the Forbearance Expiration Date (September 30, 2020) expired, but the Borrowers failed to commence making any required installment payments under the loan documents or otherwise comply with its obligations under the extension agreements. *Id.* at 2, 7, 12, 17. As a result of the Borrowers' failure to commence payments after the Forbearance Expiration Date, the letters provide notice that the maturity dates of the notes were accelerated and demanded immediate payment of the entire unpaid principal balance plus accrued and unpaid interest thereon and costs and attorneys' fees. *Id.* They also stated that as a result of the default and acceleration, Fannie Mae may immediately institute foreclosure proceedings. *Id.* The letters also note that Fannie Mae is informed that serious health, safety and habitability issues may exist at the properties, and Fannie Mae reserves any and all rights under the loan documents and applicable law to address such issues. *Id.* at 4, 9, 14, 19.

On February 5, 2021, Fannie Mae sent pre-negotiation letters to the attorneys representing the Borrowers (Rec. Docs. 25-13, 25-23, 25-33, 25-43). These letters, which Bruno acknowledged and signed on February 9, 2021, identified information

Borrowers needed to provide to Fannie Mae and listed twelve terms and conditions on which Fannie Mae would be willing to hold discussions regarding "potential workout/restructuring plan[s] for the defaulted Loan[s]." *Id.* They also explain Fannie Mae's policy, under certain circumstances, to pursue "parallel paths:" pursuing foreclosure and other rights while at the same time negotiating a possible restructuring of the loan. *Id.* However, Fannie Mae notes that until a Loan Modification is fully executed and delivered, Fannie Mae reserves all of their rights under the loans. *Id.*

In April 2021, Fannie Mae filed a foreclosure action against each Borrower in the Civil District Court for the Parish of Orleans. (Request for Judicial Notice, Rec. Doc. 26, at 2). On January 27, 2022, the Cypress Park Borrower, Westbank Borrower, and Forest Park Borrower each initiated separate, voluntary bankruptcy proceedings in the United States Bankruptcy Court for the Eastern District of Louisiana. *Id.* On February 23, 2022, the Riverview Borrower also initiated a voluntary bankruptcy proceeding in the Eastern District, and the Bankruptcy Court consolidated the bankruptcy actions for procedural purposes. *Id.* at 3. On March 28, 2022, Fannie Mae filed a Motion to Appoint Trustee in the consolidated bankruptcy proceeding, and on August 1, 2022 after four days of evidentiary hearings, the Bankruptcy Court issued a Memorandum Opinion and Order appointing a chapter 11 trustee to preside over the jointly administered bankruptcy actions. *Id.*; (Rec. Doc. 25-1, at 6).

## LEGAL STANDARD

Summary judgment is appropriate when "the pleadings, the discovery and disclosure materials on file, and any affidavits show that there is no genuine issue as to any material fact and that the movant is entitled to judgment as a matter of law." *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986) (citing FED. R. CIV. P. 56); *see Little v. Liquid Air Corp.*, 37 F.3d 1069, 1075 (5th Cir. 1994). When assessing whether a dispute as to any material fact exists, a court considers "all of the evidence in the record but refrains from making credibility determinations or weighing the evidence." *Delta & Pine Land Co. v. Nationwide Agribusiness Ins. Co.,* 530 F.3d 395, 398 (5th Cir. 2008). All reasonable inferences are drawn in favor of the nonmoving party, but a party cannot defeat summary judgment with conclusory allegations or unsubstantiated assertions. *Little*, 37 F.3d at 1075. A court ultimately must be satisfied that "a reasonable jury could not return a verdict for the nonmoving party." *Delta*, 530 F.3d at 399.

If the dispositive issue is one on which the moving party will bear the burden of proof at trial, the moving party "must come forward with evidence which would 'entitle it to a directed verdict if the evidence went uncontroverted at trial.'" *Int'l Shortstop, Inc. v. Rally's, Inc.,* 939 F.2d 1257, 1264-65 (5th Cir. 1991). The nonmoving party can then defeat the motion by either countering with sufficient evidence of its own, or "showing that the moving party's evidence is so sheer that it may not persuade the reasonable fact-finder to return a verdict in favor of the moving party." *Id.* at 1265.

If the dispositive issue is one on which the nonmoving party will bear the burden of proof at trial, the moving party may satisfy its burden by merely pointing out that the evidence in the record is insufficient with respect to an essential element of the nonmoving party's claim. *See Celotex*, 477 U.S. at 325. The burden then shifts to the nonmoving party, who must, by submitting or referring to evidence, set out specific facts showing that a genuine issue exists. *See id.* at 324. The nonmovant may not rest upon the pleadings but must identify specific facts that establish a genuine issue for trial. *See id.* at 325; *Little*, 37 F.3d at 1075.

## DISCUSSION

Fannie Mae seeks summary judgment on the issue of whether Bruno is liable for the Borrowers' indebtedness due under each of the loans based on the provisions of the Guaranties and the Loan Agreements. Specifically, Fannie Mae argues that the Borrowers' filing of the bankruptcy cases and the Bankruptcy Court's issuance of the order appointing a trustee are events named in the Loan Agreements that render Bruno liable for the entirety of the Borrowers' indebtedness. Fannie Mae also contends that Bruno has no defenses to his personal liability created by the bankruptcy events, because he waived defenses in his contracts with Fannie Mae and because the Louisiana Credit Agreement Statute bars his affirmative defenses.

Bruno claims first that, in order for Bruno to incur personal liability under the Loan Agreement, Fannie Mae must prove that he committed a breach, meaning that the amounts, obligations and liabilities are owed to Fannie Mae. Bruno argues that Fannie Mae cannot carry its burden of proving Borrowers breached the loan

agreements because Fannie Mae wrongfully caused the bankruptcy events that constituted the events of default underlying the claim. He also claims that he did not waive his defenses against Fannie Mae's claims and that the motion should be denied as premature.

## I.   Prematurity

As an initial matter, despite Bruno's argument that he needs additional discovery to fully defend against the motion, Fannie Mae's motion for partial summary judgment is ripe for resolution on the legal issues of contract interpretation presented in the motion. First, the instant motion is premised on loan and guarantee contracts that can be interpreted as a matter of law at the summary judgment stage.[1] *See Angus Chem. Co. v. Glendora Plantation, Inc.*, 782 F.3d 175, 180 (La. 2015) ("The determination of whether a contract is clear or ambiguous is a question of law. Moreover, when a contract can be construed from the four corners of the instrument without looking to extrinsic evidence, the question of contractual interpretation is answered as a matter of law. . ."). In fact, for the specific types of contracts at issue in this case, "Louisiana courts routinely grant lenders' motions for summary judgment against guarantors upon proof of both the existence of an underlying debt and the guarantor's signature upon a guaranty agreement covering that debt." *Whitney Bank v. Carbine*, 302 So. 3d 115, 120 (La. App. 4 Cir. 2020). Bruno claims

---

[1] Louisiana law governs interpretation of the contracts in this case, including the Loan Agreements "and any other Loan Document which does not expressly identify the law that is to apply to it," as the law of "the Property Jurisdiction." (Loan Agreements, Rec. Doc. 25-4, at 85; Rec. Doc. 25-14, at 87; 25-24, at 77; 25-34, at 77). All of the multifamily properties in this case are located in Louisiana, so the loan documents are construed in accordance with substantive law of the jurisdiction where the property that secures the loans is located.

that discovery is needed as to intent, motive, and bad faith. However, "when the words of a contract are clear and explicit and lead to no absurd consequences, no further interpretation may be made in search of the parties' intent." La. Civ. Code Ann. art. 2046. Bruno does not argue that the contracts here are unclear or ambiguous and instead relies on his claim that "many issues related to [his] defenses touch on subjective issues, such as motivation and intent" as well as impairment of the collateral (Rec. Doc. 46, at 48-49). Finding no genuine issue as to whether the contracts in this case are clear and explicit, no further search of the parties' intent may be made through discovery.

Second, in raising the prematurity argument in his opposition, Bruno essentially seeks reconsideration of the Magistrate Judge's Order staying discovery pending a ruling on this motion. (Rec. Doc. 37). After a hearing on Fannie Mae' motion for a protective order staying discovery, Magistrate Judge van Meerveld found good cause to stay discovery because the instant partial motion for summary judgment raises legal issues, and because Bruno's requested discovery appeared unnecessary to respond to it. *Id.* at 1. The Court also noted that many documents had already been produced to Bruno in the related proceedings, and Fannie Mae should not be burdened by responding to discovery requests which may be mooted by resolution of the instant motion. *Id.* at 1-2. Considering the number of documents and detail in the summary judgment record as well as the type of issues raised in the motion, the Court finds no basis to reconsider Magistrate Judge van Meerveld's stay on discovery.

Accordingly, the Court finds that the motion for partial summary judgment is not premature.

## II.   Bruno's   Personal   Liability:   Guaranties,   Default/Breach, Bankruptcy Events

Fannie Mae moves to recover under the Guaranties Bruno signed, in which he guaranteed "absolutely, unconditionally and irrevocably" the "full and prompt payment and performance" of all amounts and liabilities owed to the Lender under Section 3.02(b)(3) of the Loan Agreements, plus "all costs and expenses" including attorneys fees. (Rec. Doc. 25-1, at 11) (quoting Guaranties, Rec. Docs. 25-7, 25-17, 25-27, 25-37, at 2). Article 3 of the Loan Agreements is titled "Personal Liability" and explains that the Borrowers and their directors and officers shall not have personal liability for the indebtedness, but that this limitation does not impair the Lender's enforcement of its rights against the Guarantor. (Loan Agreements, Rec. Docs. 25-4, 25-14, 25-24, 25-34, at § 3.01). Section 3.02(a), Personal Liability of Borrower Based on Lender's Loss, specifies that the Borrower is "personally liable to Lender for the repayment of the portion of Indebtedness. . . subject to any notice and cure period" if, *inter alia*, the Borrower fails to pay as directed by Lender "upon demand after an Event of Default (to the extent actually received by Borrower). *Id.* at § 3.02(a). Section 3.02(b), Full Personal Liability for Mortgage Loan states that the Borrower is personally liable for repayment of all of the indebtedness upon, *inter alia*, the occurrence of "any Bankruptcy Event." *Id.* at § 3.02(b)(3). The Loan Agreement Definition Schedule defines "Bankruptcy Event" as any one of a list of five events, including "the commencement, filing or continuation of a voluntary case or proceeding

under one or more of the Insolvency Laws by Borrower" and "the appointment of a receiver. . .liquidator, custodian, sequestrator, trustee or other similar officer who exercises control over Borrower or any substantial part of the assets of Borrower." *Id.* at Schedule 1.

Fannie Mae argues that the six Borrowers' filing of bankruptcy cases in January and February 2022 constitutes a Bankruptcy event, which results in personal and recourse liability as to each Borrower under Section 3.02(b) of the Loan Agreement. (Rec. Doc. 25-1, at 12). Fannie Mae also claims that, because the Bankruptcy Court appointed a trustee in the Borrowers' consolidated bankruptcy case on August 1, 2022, that appointment constitutes a separate Bankruptcy Event under Section 3.02(b). *Id.* at 12-13. Because Bruno's Guaranty agreements provide that he guarantees full payment for amounts owed under Article 3 (including Section 3.02(b)) of the Loan Agreement, Fannie Mae contends that Bruno is thus personally liable for the full amount of indebtedness due under the Notes and Loan Documents by the bankrupt Borrowers, plus costs, expenses, and attorneys fees. *Id.*

In opposition, Bruno presents two arguments. First, he claims that personal liability under the Loan Agreements only arises "if Fannie Mae can prove the Borrowers committed a breach that leads to personal liability under the Loan Agreements—that is, Fannie Mae must show that amounts, obligations and liabilities are owed to Lender Under Article 3." (Rec. Doc. 46, at 29) (internal quotation marks omitted). Second, Bruno argues that the bankruptcy filings on which Fannie Mae relies occurred because "Fannie Mae cut the Borrowers off at the knees by wrongfully

14

accelerating the entirety of the millions of dollars in debt under the loans and demanding those sums, terminating Borrowers' licenses to collect rents from their tenants, and foreclosing on the Properties securing the Loans, based on alleged Monetary Defaults that had not occurred." (Rec. Doc. 46, at 32).

In Louisiana, "contracts of guaranty or suretyship are subject to the same rules of interpretation as contracts in general. Agreements legally entered into have the effect of laws on those who formed them and must be performed in good faith." *Ferrell v. S. Cent. Bell Tel. Co.*, 403 So. 2d 698, 700 (La. 1981); La. Civ. Code art. 1983. "When a contract can be construed from the four corners of the instrument without looking to extrinsic evidence, the question of contractual interpretation is answered as a matter of law." *Wooley v. Lucksinger*, 61 So. 3d 507, 558 (La. 2011). Additionally, a contract provision that is susceptible to different meanings must be interpreted with a meaning that renders the provision effective, and not with one that renders it ineffective. La. Civ. Code art. 2049. Each provision must be interpreted in light of the other provisions so that each is given the meaning suggested by the contract as a whole. La. Civ. Code art. 2050.

In this case, the parties entered several contracts for each property, including the Loan Agreements, Notes, Guaranties, Forbearance Agreements, and Forbearance Extensions. Each of these contracts is clear and unambiguous and can be construed from the four corners of the instruments. The Guaranties indicate that Bruno, in his personal capacity, guaranteed the full and prompt payment of the loan amounts and obligations owed to Fannie Mae under Article 3 of the Loan Agreement. (Guaranties,

Rec. Docs. 25-7, 25-17, 25-27, 25-37, at 2). Article 3 of the Loan Agreement offers two relevant paths to personal liability of the Borrowers, set out in § 3.02(a) and § 3.02(b). Section 3.02(a) provides for the Borrowers' personal liability for a portion of the indebtedness equal to the Lender's losses for its failure to pay upon demand after an Event of Default. (Loan Agreements, Rec. Docs. 25-4, 25-14, 25-24, 25-34, at § 3.02). Automatic Events of Default include any failure by Borrower to pay or deposit any amount required as well as the occurrence of any Bankruptcy Event. *Id.* at § 14.01(a). Section 3.02(b), on the other hand, provides for the Borrowers' personal liability for *all* of the indebtedness upon the occurrence of a Bankruptcy Event. *Id.* at § 3.02.

Although both of these paths to personal liability for the Borrowers appear to the Court to be relevant to the facts in this case, Fannie Mae argues that Bruno is personally liable under Section 3.02(b) because of the January and February 2022 bankruptcy filings and the August 1, 2022 appointment of a bankruptcy trustee. Considering that the Loan Agreements define a Bankruptcy Event to include the commencement of a voluntary bankruptcy proceeding and the appointment of the trustee, the plain language of the Loan Agreement indicates that two Bankruptcy Events occurred relevant to each contract: the Borrowers' filing of the bankruptcy cases and the Bankruptcy Court's appointment of a bankruptcy trustee. Because the Bankruptcy Events occurred, the Court finds that automatic Events of Default also occurred under the Loan Agreements. Remedies for an Event of Default include: the entire unpaid principal and interest of the loan become due and payable without any prior written notice, the right to accelerate regardless of any prior forbearance, and

foreclosure on the mortgaged property. (Loan Agreements, Rec. Docs. 25-4, 25-14, 25-24, 25-34, at § 14.02(a)). Additionally, the occurrence of a Bankruptcy Event "shall automatically accelerate the Mortgage Loan and all obligations shall be immediately due and payable without written notice or further action by Lender." *Id.* By an unambiguous reading of these provisions, the fact that the Borrowers filed for bankruptcy automatically accelerated the loan, and the Borrowers became personally liable for all payments immediately due, without any written notice required from Fannie Mae and regardless of any previous forbearance. At that point, because the Borrowers became personally liable for all of the indebtedness under Article 3, specifically § 3.02(b)(3) ("the occurrence of any Bankruptcy Event"), the Guaranties require that Bruno, as the Guarantor, personally "absolutely, unconditionally, and irrevocably" guarantee to the Fannie Mae "all amounts, obligations and liabilities owed to Lender under Article 3 of the Loan Agreement." (Guaranties, Rec. Docs. 25-7, 25-17, 25-27, 25-37, at 2).

Bruno contends that, in order for the Guaranty agreement to be triggered under Article 3, Fannie Mae must prove the Borrowers owed amounts, obligations and liabilities. (Rec. Doc. 46). This argument is unsupported by the four corners of the Loan Agreement, which provide for Article 3 liability (to the Borrower, and then ultimately to the Guarantor) in the case of <u>both</u> failure to pay (§ 3.02(a)) <u>and</u> the occurrence of a Bankruptcy Event (§ 3.02(b)). Furthermore, affidavit evidence from Fannie Mae demonstrates that the Borrowers failed to make the required monthly debt service payments even before the parties executed the Forbearance Agreements.

(Shaddox Affidavit, Rec. Doc. 25-3, at 5). Bruno argues that "there were no Monetary Defaults because the Borrowers obtained forbearances pursuant to the written First and Second Forbearance agreements." (Rec. Doc. 46, at 36). However, the clear and explicit language of the Forbearance Agreements ("the Loan and Note are currently delinquent," and "the Note remains in default"), which Bruno signed on behalf of each Borrower, demonstrates that those agreements notified Bruno that the note and loan were in default as early as April 2020 for failure to pay. (Forbearance Agreements, Rec. Docs. 25-10; 25-20; 25-30; 25-40, each at 1, 3).

In its reply, Fannie Mae also notes that the February 2021 Pre-Negotiation Letters also establish, as a matter of law, the Borrowers' defaults and proper acceleration of the loans. (Rec. Doc. 50, at 5). Those letters state that the loans are in default and accelerated by virtue of an Event of Default: the fact that Borrowers failed to commence making required installment payments *after* the September 2020 forbearance expiration date. (Rec. Docs. 38-2, at 2; 25-12, at 2). Bruno has provided no evidence to contest Fannie Mae's assertion that the Borrowers failed to make all payments due, both before the forbearance terms began and immediately after the forbearance expiration date.[2] Therefore, the Court finds that, notwithstanding the

---

[2] Bruno provided evidence of checks paid on January 4, 2021. (Rec. Doc. 46-33). However, by January 4, 2021, the Borrowers had already failed to make payments due since the forbearance expiration over three months before. By January 2021, the Borrowers had already failed to pay amounts required by the Note and by the Forbearance Agreements, resulting in an automatic Event of Default under § 14.01(a) of the Loan Agreement. The Forbearance Agreements and Extensions also required Borrowers to bring the loan current through monthly payments, and upon failure to do so, Fannie Mae's agreement to forbear exercising its rights under the Loan Agreement immediately terminates without notice or demand. Rec. Docs. 25-10; 25-20; 25-30; 25-40, each at 2). Thus, when the Borrowers failed to make payments after the forbearance expiration, Fannie Mae was entitled to its rights under the Loan Agreement, including those in Article 3.

Bankruptcy Events triggering Bruno's personal liability under the Guaranties, the Pre-Negotiation Letters provide evidence of Events of Default that also require Bruno to guarantee the amounts owed under Article 3 of the Loan Agreements.

Bruno also argues that Fannie Mae cannot prevail because Fannie Mae's wrongful conduct caused the Borrowers' bankruptcies by wrongfully defaulting and accelerating the loans, instituting foreclosure proceedings, and preventing them from collecting rent from tenants. (Rec. Doc. 46, at 35). As the Court explained above, Fannie Mae correctly recognized Events of Default under the Loan Agreements, properly accelerated the loans, and instituted foreclosure proceedings—all remedies listed in the Loan Agreements Section 14.02(a). The Loan Agreements also provide that the Borrower shall "pay to Lender upon demand all Rents after an Event of Default has occurred and is continuing." (Loan Agreements, Rec. Docs. 25-4, 25-14, 25-24, 25-34, at § 7.02(c)(1)). The January 2021 default letters required the same: "BORROWERS LICENSE TO COLLECT RENTS HAS TERMINATED, AND FANNIE MAE IS NOW ENTITLED TO ALL RENTS AS THEY BECOME DUE AND PAYABLE." (Rec. Doc. 25-12, at 3). According to the clear and unambiguous terms of the Loan Agreements, Fannie Mae is entitled to each of these remedies because of the Events of Default under the loan, and Bruno's equitable arguments otherwise are unavailing. Fannie Mae did not breach the parties' agreement, and Bruno provides no evidence that Fannie Mae contributed to the Borrowers' inability to make payments on the loan.

### III.   Bruno's Waiver of Defenses

Finally, Fannie Mae argues that Bruno has waived any defenses to liability by the explicit terms of the Guaranties, Loan Documents, and Pre Negotiation Letters. (Rec. Doc. 25-1, at 13).

Each of the Guaranties Bruno signed state that,

> Guarantor agrees that performance of the obligations hereunder shall be a primary obligation, shall not be subject to any counterclaim, set-off, recoupment, abatement, deferment **or defense** based on any claim that Guaranto may have against Lender, Borrower, any other guarantor or any other person or entity, and **shall remain in full force and effect without regard to, and shall not be released, discharged, or affected in any way by any circumstance or condition (whether or not Guarantor shall have knowledge thereof), including: . . .**

> (b) any failure, omission, or delay on the part of Borrower, Guarantor. . . or Lender to conform or comply with any term of any of the Loan Documents **or failure of Lender to give notice of any Event of Default; . . .**

> (c) any action or inaction by Lender under or in respect of any of the Loan Documents. . .

> (d) any Bankruptcy Event. . .

> (h) **any other occurrence, circumstance, happening or event, whether similar or dissimilar to the foregoing, and whether seen or unforeseen, which otherwise might constitute a legal or equitable defense** or discharge of the liabilities of a guarantor or surety or which otherwise might limit recourse against Borrower or Guarantor to the fullest extent permitted by law.

(Guaranties, Rec. Docs. 25-7, 25-17, 25-27, 25-37, at Section 7) (emphasis added). The February 2021 Pre-Negotiation Letters also provided for express waivers of defenses for the Borrowers. (Pre-Negotiation Letters, Rec. Docs. 25-13, 25-23, 25-33, 25-43, each at § 3 Waiver of Claims and Defenses) ("Borrower and Key Principal further waive and release any and all defenses that they may have to the rights and remedies

of Fannie Mae. . . under the provisions of the Loan Documents and applicable law"). Despite this language, Bruno contends that Section 3 of the Guaranties directs that the guaranty obligations are implicated only if there has been event triggering personal liability under the Loan Agreements, and Fannie Mae must prove a default. (Rec. Doc. 46, at 37).

Having already determined that Fannie Mae provided sufficient evidence for the Events of Default, the Court also finds that the waivers of defenses are valid under Louisiana law. Contracts of guaranty and suretyship are subject to the same rules of interpretation as contracts in general, and Louisiana law allows parties to contract to modify or limit the rights and remedies otherwise normally available to sureties under the Civil Code. *Ferrell v. South Central Bell Telephone Co.*, 403 So. 2d 698, 700 (La. 1981); *First National Bank of Crowley v. Green Garden Processing Company, Inc.*, 387 So. 2d 1070, 1073 (La. 1980); La. Civ. Code art. 3040. "Both Louisiana and Fifth Circuit jurisprudence hold that, to the extent a guarantor contractually waives one of his rights under the Civil Code, he may not later escape liability under the guaranty on the basis that such right has been violated." *Hancock Bank of Louisiana v. Advoc. Fin., LLC*, No. CIV.A. 10-132-FJP, 2011 WL 94425, at *3 (M.D. La. Jan. 11, 2011) (citing *First National Bank of Crowley*, 387 So. 2d at 1073-74; *FDIC v. Gilbert*, 9 F.3d 393, 396–97 (5th Cir. 1993)).

Waiver is "the intentional relinquishment of a known right, power, or privilege." *Steptore v. Masco Const. Co.*, 643 So. 2d 1213, 1216 (La. 1994). The meaning and intent of the parties to a contract, including a compromise or release of

rights, is "ordinarily determined from the four corners of the instrument, and extrinsic (parol) evidence is inadmissible either to explain or to contradict the terms of the instrument." *Brown v. Drillers, Inc.*, 630 So. 2d 741, 748 (La. 1994). If a release refers expressly to the claim sought to be released, the party challenging the release cannot "merely make the self-serving allegation that there was no meeting of the minds," and "a party represented by counsel may not defeat a written settlement agreement and release that is unambiguous on its face by merely alleging that he did not understand it." *Hymel v. Eagle, Inc.*, 7 So. 3d 1249, 1257 (La. App. 4 Cir. 2009) ("Signatures on documents are not mere ornaments. . . If a party can read, it behooves him to examine an instrument before signing it"). Further, "a person who signs a written instrument is presumed to know its contents and cannot avoid its obligations by contending that he did not read it, or that it was not explained or that he did not understand it." *Smith v. Leger*, 439 So. 2d 1203 (La. App. 1st Cir.1983).

If a dispute arises as to the scope of a compromise agreement or release of rights, the party raising the dispute must present "some substantiating evidence of mistaken intent" for extrinsic evidence to be considered. *See id.* at 749. Louisiana courts limit their use of substantiating evidence is to cases with (1) evidence that the releasor was mistaken as to what he or she was signing, even though fraud was not present or (2) evidence that the releasor did not fully understand the nature of the rights being released or that the releasor did not intend to release certain aspects of their claim. *Id.* Without that substantiating evidence, courts apply Louisiana's general rules of construction, such that "contractual interpretation is answered as a

matter of law and thus summary judgment is appropriate." *Id.* at 750; La. Civ. Code art. 2046 ("When the words of a contract are clear and explicit and lead to no absurd consequences, no further interpretation may be made in search of the parties' intent").

Bruno has not presented either type of substantiating evidence necessary for this Court to venture outside the four corners of the Guaranties or the Pre-Negotiation Letters to determine intent. Instead, he relies only on conclusory statements in his affidavit that he did not intend to release Fannie Mae from its obligations in executing the guaranty agreements and the Pre-Negotiation Letters. (Rec. Doc. 46-3, at 6-7). Those self-serving statements, without any additional evidence, are not sufficient to override his clear and explicit waivers of defenses included in the Guaranties.

Additionally, "a surety may assert against the creditor any defense to the principal obligation that the principal obligor could assert except lack of capacity or discharge in bankruptcy of the principal obligor." La. Civ. Code art. 3046. In this case, the principal obligors, the Borrowers, waived "any and all defenses they may have to the rights and remedies of Fannie Mae" in agreeing to the Pre-Negotiation Letters. (Pre-Negotiation Letters, Rec. Docs. 25-13, 25-23, 25-33, 25-43, each at § 3). Because Bruno, as the surety/Guarantor, may assert any defense that the Borrowers, as the principal obligor, could assert, and the Borrowers waived any and all defenses, Bruno also waived all defenses that could have been available to the Borrowers. Bruno urges the Court to examine parol evidence of the Borrowers' and Bruno's true intent in

entering the Pre-Negotiation Letters. Again, the Court finds that Bruno has not presented any substantiating evidence necessary to make that inquiry. Thus, the four corners of the document constrain the Court's analysis, and the plain language shows that the Borrowers waived their defenses to Fannie Mae's assertion of its rights. Thus, Bruno waived those same defenses, as a matter of law.

Finally, Bruno argues that the Pre-Negotiation Letters are unenforceable for lack of consideration, mutuality and cause, and because the Borrowers and Bruno entered into the contracts at issue under duress. (Rec. Doc. 46, at 45). Bruno cites to jurisprudence requiring consideration for compromises, which are "contracts whereby the parties, through concessions made by one or more of them, settle a dispute or an uncertainty concerning an obligation or other legal relationship." La. Civ. Code art. 3071. Although the Pre-Negotiation Letters contain releases similar to clauses that could be contained in compromises or settlement agreements, the Pre-Negotiation Letters do not exactly fit the definition of compromises. Instead, they are contracts in which the parties agreed to explore a potential workout of the defaulted and accelerated loans. Louisiana does not require consideration for an enforceable contract, and "the mere will of the parties will bind them, without what a common law court would consider to be consideration to support a contract, so long as the parties have a lawful cause." *Se. Holdings, LLC v. Mouhaffel*, 353 So. 3d 136, 140 (La. App. 1 Cir. 2022) (internal quotations omitted). The potential to continue to negotiate and explore solutions regarding the loans plus the possibility of avoiding further

delay and cost were both Fannie Mae's and Bruno's lawful cause—the reason why they signed the agreement.

Bruno claims that he and the borrowers were under economic duress because Fannie Mae had deemed the Borrowers in default, demanded payment, and cut off their ability to collect rent. (Rec. Doc. 46). Duress vitiates consent when it is of such a nature as to cause a reasonable fear of unjust and considerable injury to a contracting party's person, property, or reputation. La. Civ. Code art. 1959. Economic duress does not include the "mere stress of business conditions" if the opposing party did not engage in conduct designed to produce that stress or create economic hardship. *Pellerin Const., Inc. v. Witco Corp.*, 169 F. Supp. 2d 568, 579 (E.D. La. 2001); *see also Utley–James of La., Inc. v. Louisiana Dept. of Facility Planning & Control*, 593 So. 2d 1261, 1268 (La. App. 1st Cir.1991) (finding that the State's action was not economic duress because it was not designed to create an economic hardship on the plaintiff). Bruno presents no evidence that Fannie Mae's actions were unjust or designed to produce economic hardship. Although the Borrowers were in a stressful business position when they executed the agreements, Fannie Mae was legally entitled to declare the Loans in default, foreclose, and collect the rent directly, according to the unambiguous terms of the Loan Agreements.

When the provisions of the Pre-Negotiation Letters and the Guaranties are read together, Bruno and the Borrowers waived the claims and defenses they may have had against Fannie Mae in the event of Fannie Mae enforcing its rights under the Loan Agreements.  Accordingly,

## <u>CONCLUSION</u>

**IT IS HEREBY ORDERED** that the *Motion for Partial Summary Judgment* **(Rec. Doc. 25)** on the issue of Bruno's personal liability is **GRANTED**.

New Orleans, Louisiana, this 2nd day of June, 2023.

CARL J. BARBIER
UNITED STATES DISTRICT JUDGE